**Mark PRINCE, Plaintiff,**

v.

**Steve THOMAS, Defendant.**

No. C–94–1419 CAL.

United States District Court,
N.D. California.

Dec. 24, 1997.

J. Scott McKay, Boyd & McKay, San Francisco, CA, for Plaintiff.

Nancy A. Aptekar, John F. Meadows, Jedeikin Green Meadows & Schneider, San Francisco, CA, for Defendants.

*OPINION FOR JUDGMENT*

LEGGE, District Judge.

## I.

This action arises from a boating accident. Although there is conflicting evidence about many aspects of the accident and its consequences, certain basic facts of the occurrence are not in material dispute.

Plaintiff was a sea urchin fisherman. He performed his occupation by diving to gather urchins on the bottom of the ocean, with his air supply being provided by a hose connected to an air compressor on his boat. At the time of the accident, plaintiff's boat was anchored in Point Area Cove, and plaintiff was in the water, beneath the surface, gathering urchins. Two other urchin boats were anchored in the area, with plaintiff's boat being the furthest west.

Defendant was operating an inflatable boat, powered by an outboard motor. He and two companions, together with their equipment, were in the boat to go scuba diving. Defendant left the pier at Point Arena Cove for the purpose of going west, and then north around the point of land that forms the cove, to their intended diving area. While doing so, defendant's boat entangled plaintiff's air line, dragging him along some rocks below the surface and pulling him abruptly to the surface.

## II.

Plaintiff brings this action, alleging defendant's negligence and claiming substantial damages, both economic and medical. Defendant denies any negligence, alleges plaintiff's own negligence, and disputes the damages which plaintiff claims. Two other persons were named as defendants; but they settled with plaintiff, leaving only defendant Steve Thomas, the operator of the inflatable boat.

This court has jurisdiction over the case under the admiralty jurisdiction of the United States Courts. 28 U.S.C. § 1333 and F.R.C.P. 9(h). Because it is an action in admiralty, the trial was conducted by the court sitting without a jury. These are the findings of fact and conclusions of law required by Rule 52(a) of the F.R.C.P. The court has heard and reviewed the testimony of the witnesses, has read the exhibits, has reviewed the record of the case, and has read the applicable authorities.

This opinion will follow this outline: The court will first discuss the general legal principles that are applicable (Section III). Then the court will resolve whether defendant was negligent in the operation of his boat (Section IV). The court will then consider whether plaintiff was negligent, and the relative contribution of his negligence to the accident (Section V). The court will then evaluate the numerous elements of claimed damages (Sections VI–IX).

In summary, the court finds that defendant was negligent in the operation of his boat; that plaintiff was also negligent and contributed to the accident to the extent of twenty-five per cent (25%); and that plaintiff is entitled to recover damages from defendant in the amount of $414,761.

## III.

Before analyzing the evidence, it is appropriate to state the governing legal principles.

When jurisdiction is maritime, the claims are determined under general principles of maritime negligence rather than common law negligence. *See Pope and Talbot v. Hawn,* 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953); *Schoenbaum,* Admiralty and Maritime Law, 2nd Ed.1994, pp. 156–57. However, the elements for a maritime negligence cause of action are defined similarly to the common law: a duty, a breach of the duty, proximate cause, and damages. The sources of maritime negligence law are fashioned by the federal courts, by Congressional enactments, and also by international conventions and treaties. In this case, we are also guided by the (1) Coast Guard's Rules of Navigation (U.S. Department of Transportation, United States Coast Guard, International Navigation Rules, 1995); (2) local custom and practice; and (3) the general dictates of reasonableness and prudent maritime conduct.

**1048**

■ If the court finds both plaintiff and defendant to have been negligent, the fault of each is assessed on the "comparative degree of fault." *United States v. Reliable Transfer Company*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); and see, on remand, 522 F.2d 1381 (2d Cir.1975).

### IV.

■ Plaintiff charges that defendant was negligent in the operation of his boat. Defendant certainly owed a duty of care to the other boats anchored in the cove through which defendant drove. Plaintiff alleges negligence with respect to defendant's speed, choice of course, and proximity to the anchored boats, including plaintiff's. This court agrees.

When defendant left the pier he could have proceeded west and slightly south and have avoided the group of anchored boats. When he passed the third in line, plaintiff's boat, defendant could then have turned north to go around the point to defendant's intended dive location. Instead, defendant's course wove through the three anchored boats. Those three boats were not pleasure craft; they were not at a pier or on moorings, but were anchored; and they were obviously engaged in some activity. Defendant nevertheless pursued a weaving course through them. As defendant went around the first two boats, he was waved away by people on those boats. They testified that defendant was going too fast and navigating too close, and they were afraid of the consequences to their urchin fishermen. After passing the first two, defendant approached plaintiff's boat toward its starboard side; plaintiff's boat was at anchor, with the bow facing into the wind coming from the north. Defendant then went around the bow of plaintiff's boat and proceeded on the port side of plaintiff's boat, where he then intercepted plaintiff's air hose. Defendant's movements were too fast and too irregular for defendant to have been effectively waved away by the deck hand on plaintiff's boat.

Although the testimony differed as to defendant's exact speed, and as to the exact distances between defendant's boat on the one hand and plaintiff's boat and the other two anchored boats on the other hand, the court finds as a matter of fact that plaintiff was traveling too fast for the circumstances and was navigating too close to all three anchored boats.

These conclusions are consistent with the Coast Guard's navigation rules:

(1) Rule 2 is a general rule on Responsibility, which states that the operator of a boat shall not "neglect ... any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." The rule also states that "due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved ...."

(2) Rule 6 states a general prudence principle regarding Safe Speed. It requires that every vessel "at all times proceed at a safe speed so that she can take proper and effective action to avoid collision ...." Subsection (a) of that rule enumerates certain factors which are applicable here. Subparagraph (a)(ii) refers to "traffic density including concentrations of fishing vessels."

(3) Under Rule 7, defendant also had the obligation to use "all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exist[ed]."

(4) Rule 16 provides that every vessel which is directed to keep out of the way of another shall "take early and substantial action to keep well clear."

(5) And Rule 18 specifically provides that a power-driven vessel is to keep out of the way of "a vessel restricted in her ability to maneuver" and "a vessel engaged in fishing." Reserving for later the issue of whether plaintiff was engaged in "fishing," it is clear that plaintiff's boat was anchored and could not maneuver.

The court therefore finds and concludes that defendant was negligent in the operation of his boat and breached the duty of care that he owed to plaintiff.

## V.

Defendant asserts that plaintiff was himself negligent, and was "at fault" for assuming comparative liability. Defendant's arguments focus on three claims: (1) plaintiff had no lookout aboard his boat, or the lookout acted negligently; (2) plaintiff did not have certain types of safety equipment; and (3) plaintiff's boat was not displaying an appropriate flag or other shape which would have warned defendant that plaintiff was diving near his boat. The first two of these arguments do not require much discussion.

■ (1) Coast Guard Rule 5 requires that all vessels "maintain a proper lookout." The parties disagree over whether this applies to such a small vessel as plaintiff's, and over whether it applies to a vessel at anchor. But these disputes make no difference. Plaintiff did have a lookout. The lookout was on deck while plaintiff was under water, was tending the air supply to plaintiff, and was perhaps engaged in other duties. Defendant argues that the lookout did not adequately perform his duties, and that because the lookout was plaintiff's employee, plaintiff is bound by his negligence. However, this court finds no negligence on the part of the lookout. He did see defendant's boat approaching. As did the personnel on the other two boats, he yelled and waved at defendant. And even if his yelling and waving were not adequate to attract defendant's attention, it would have made no difference. That is, defendant approached the starboard side of plaintiff's boat, and then made a turn around the bow and on plaintiff's port side, where he intersected plaintiff's air supply. It would have been difficult for any lookout, given defendant's speed, proximity, and unusual maneuver, to have effectively done anything more to warn defendant or otherwise avoid the collision.

■ (2) Defendant also contends that plaintiff was negligent because he did not have certain safety gear: (a) a shackle whereby interference with the air line would put pressure on plaintiff's body harness and not on the line itself; (b) a quick release device to disengage the air hose, (c) a so-called "bailout" bottle; and (d) a dive computer, which would electronically calculate the time which plaintiff had left to make a safe return to the surface. That equipment is really not relevant to the issue of the accident itself, but only to the issues of damages, because this safety gear would not have prevented the accident from occurring. The court finds from the evidence that this additional equipment was not the standard of care in the urchin fishing industry. Plaintiff was using a dive meter. And while additional safety devices would been helpful, it was not a breach of any standard of care for plaintiff to use the equipment that he did. A person driving an automobile is not required to have all possible safety devices in order to sue a car that hits him.

(3) The more serious issue is whether plaintiff was required to display a flag or other shape to indicate that he was engaged in underwater activity, and hence to warn other boats to stay away.

■ The first step in the analysis of this question is to define the body of regulations with which we are concerned. Defendant argues that plaintiff allegedly violated state and federal OSHA requirements. This court does not believe that OSHA requirements are applicable to defining the duties of care between plaintiff and defendant. The California OSHA statute expressly states that it is not applicable in any action, except one between an employee and his employer. California Labor Code Section 6304.5. And the federal OSHA requirements have also been held not to apply in a case between an employer and a person who is not an employee. *See Jeter v. St. Regis Paper Co.*, 507 F.2d 973 (5th Cir.1975). In essence, both types of OSHA regulations govern the duties which an employer owes to his employee, and do not govern the duties between the employer and a third party.

However, the Coast Guard regulations do apply. The record is clear that plaintiff did not have an alpha flag, or any other type of "diver down" flag. Plaintiff did have a basket shape aboard the vessel. But it was a utility basket in which gear was stowed, and was not one used to display to other vessels. The testimony indicated that the basket was on the roof of plaintiff's boat. But it was not

displayed in the rigging because the boat had no mast.

The parties differ in their interpretation of which Coast Guard regulation applies. Plaintiff contends that his was a "vessel engaged in fishing," and that under the applicable version of Rule 26 plaintiff's boat (a boat of less than twenty meters in length) was only required to display the shape of a basket. Defendant contends that plaintiff's boat was a "vessel engaged in diving operations" under Rule 27(e), and was therefore obliged to display a rigid replica of the international alpha flag required by that rule.

The definition section of the regulations does not clearly answer the question. Rule 3(d) defines a "vessel engaged in fishing" as "fishing with nets, lines, trolls, or other fishing apparatus which restrict maneuverability." That definition does not expressly refer to a diver who is under water gathering sea life while attached to his vessel by an air hose.

This court concludes that the applicable regulation is Rule 27(e). The court so holds for two reasons. First, it is the more specific of the rules that are applicable to these facts. Even if plaintiff's activities are described as "fishing" for the purposes of Rules 3 and 26, plaintiff was more specifically "engaged in diving operations." Second, are the *risks* which Rules 26 and 27 were meant to prevent. Rule 26, and the definition of "fishing" incorporated from Rule 3, appear to focus on the vessels themselves and seek to prevent collisions between the vessels. On the other hand, Rule 27(e) focuses on "diving operations" and appears to envision the risk of harm *to a diver*. And that risk of harm is the one that occurred here. That is, the injury was not the collision of two vessels, but one vessel coming into contact with the apparatus of a diver under the water.

The rule about displaying a warning flag is also consistent with the common practice in sport diving. A red flag with a white diagonal stripe, indicating a "diver down," although not required by Coast Guard regulations, has become a common and accepted practice in ocean diving. And it only makes sense that a diver who is adequately concerned for his own safety would want to warn other boats that he was under the water so they would be more careful around him. No less can be expected of plaintiff, who was engaged in diving as his occupation. Therefore, even apart from the Coast Guard regulations, the absence of a warning flag violated prudent maritime conduct.

The court therefore concludes that plaintiff was in violation of Rule 27(e), and also of prudent maritime conduct, by not displaying an alpha flag or indeed *any* other flag warning of a diver below. Because of the violation of the Coast Guard regulations, the burden of proof shifts to plaintiff to show by clear and convincing evidence that his violation could not reasonably have been a proximate cause of his injury. *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873); *Pacific Tow Boat Co. v. States Marine Corp.,* 276 F.2d 745, 749 (9th Cir.1960).

There was evidence that the use of an alpha flag was not customary among urchin fishermen. And there was evidence that in prior Coast Guard examinations of urchin boats, the Coast Guard had not cited any violations for the absence of alpha flags. More specifically on the issue of causation, defendant testified that he had no knowledge of the significance of an alpha flag or a basket shape. Plaintiff argues from this that even if plaintiff had displayed an alpha flag, it would not have prevented the accident. But that is too simplistic. Certainly the display of a rigid alpha flag, or indeed a rigid flag of any type, would have warned any nearby boat operator, whether with familiar with the language of the flags or not, that the boat was engaged in some activity where caution should be exercised.

The court therefore concludes that both plaintiff and defendant were negligent, and that the negligence of both contributed to the accident. Because: (1) defendant's conduct created a risk of injury *to others*, while plaintiff's conduct involved only his own safety, (2) the degree of risk created by defendant to plaintiff and to the divers from the other boats, and (3) defendant's unexpected turn around the bow to the port side of plaintiff's boat, the court concludes that the comparative fault should be assessed at seventy-five

per cent to defendant and twenty-five per cent to plaintiff.

## VI.

The court now turns to the issues of damages. Plaintiff asserts economic damages, including both losses to date and the prospective loss of earnings for the rest of his working life. He also claims medical and psychiatric damages, again both to date and for the indefinite future. In all of those claims, the court concludes that the *extent* of plaintiff's claims are not adequately supported by the evidence. The court certainly agrees that plaintiff was damaged, both physically and economically. But the extent of those claims, particularly the extension of those damages into the future, is not justified by the evidence. The court will discuss each type of plaintiff's claimed damages separately.

## VII.

■ The court begins with plaintiff's injuries at the time of the accident, and then proceeds to the differing medical opinions on the extent of plaintiff's injuries and plaintiff's claims of permanent injury.

Plaintiff claims that at the time of the accident he injured his neck, shoulder, and arm as a result of being dragged over the rocks on the floor of the cove and pulled to the surface. The court finds that these claims are credible, and that they have been proved by a preponderance of the evidence.

At the time of the accident, plaintiff was also at risk of having the "bends." That term can mean either or both (1) an immediate air embolism, resulting from the too-rapid rise to the surface; or (2) so-called decompression illness, which is the release of nitrogen from the body tissues as a result of a rapid ascent. There is a dispute in the evidence as to how deep plaintiff was at the time of the accident, and whether he had a so-called "decompression obligation." However, because the court is resolving the issues of embolism and decompression illness from the medical evidence and from plaintiff's subsequent medical history, the court need not resolve that factual dispute. The court finds from the medical evidence that

plaintiff did not suffer an air embolism. He was placed *at risk* of having an embolism by defendant's conduct. But immediately after the accident he was kept under hospital observation for several hours and none of the symptoms of an embolism appeared. The court also finds from the medical evidence plaintiff did not suffer decompression illness. Again, as a result of the accident he was certainly placed *at risk* of decompression illness. But the medical evidence is insufficient to conclude that he did have that illness.

At the time of the accident and shortly thereafter, plaintiff endured considerable pain and suffering, as well as the reasonable fear of an embolism or decompression illness. For some time thereafter, plaintiff had pain, discomfort, disorientation, memory problems and vision problems.

Plaintiff asserts that he has certain permanent medical disabilities. These include damage to his neck, shoulder, and arm, which his doctors have diagnosed as being caused by nerves being physically strained at the time of the accident. Plaintiff also claims some level of permanent brain damage allegedly resulting from his decompression. He also claims present and future psychiatric problems, including fear of the water and diving, general depression, bad family relationships, agitation, and a lack of incentive, ambition or ability to hold a job or acquire more education.

The court has reviewed all of the medical and psychiatric evidence. The court need not recite all of that evidence here. It is sufficient to say that both the medical and psychiatric testimony was conflicting on almost every point. The court believes that the following facts, which are undisputed, have a significant impact on the claimed medical damages: Plaintiff made no visits to a doctor for a three year period from June 1992, shortly after the accident, until July 1995. Plaintiff underwent no medical treatments, other than two sessions in a decompression chamber within a few days of the accident. Plaintiff returned to his occupation of diving in August 1992, and stayed with that occupation until December 1995, al-

though at a considerably lower level of production. Plaintiff did not go to any psychiatrist until after his medical examinations by the defense doctors in this litigation. Plaintiff's brain MRI was essentially negative. And there was no objective evidence of neurological problems. Plaintiff apparently still has pain in his arm, shoulder, and neck at certain times. His doctor's opinion was that there is nothing further that can be done to treat that condition, and that it may or may not improve over time.

Plaintiff's claim of permanent brain damage is not adequately supported by evidence. Essentially the only objective evidence of such damage is a so-called PET scan. But such a scan is of limited medical or evidentiary usefulness in this type of claimed injury, and the court does not believe that it offsets the essentially negative MRI and the absence of objective neurological symptoms.

The court therefore concludes that plaintiff's only enduring medical problem is his claim of psychiatric injury. He saw a psychiatrist in November 1996, after he received the reports of the defense medical examinations. His psychiatrist testified that plaintiff's condition is post-traumatic stress syndrome and a mild but persistent depression. His psychiatrist has prescribed anti-depressant medication, which has helped plaintiff. And the psychiatrist predicts that plaintiff will need further psychiatric treatment, consisting of drugs for about one year and up to two years of psychiatric treatment. The defense psychiatrist agreed that plaintiff is mildly depressed and mildly bi-polar. And she expressed the opinion that plaintiff's fears, such as the fear of the water, diving, and other employment diminish over time.

After reviewing all of the medical evidence, the court reaches the following findings and conclusions. Plaintiff did suffer an injury to his arm, shoulder, and neck, which injury is persisting and is mildly debilitating. Plaintiff has not carried his burden of proof that he suffered an embolism or decompression illness. Plaintiff has not sustained his burden of proof that he has suffered any permanent brain damage. Plaintiff does have psychiatric problems as a result of the accident. Those problems are very real to plaintiff, but they are ones which objectively are relatively mild and are controllable by medication. Plaintiff is entitled to compensation for those injuries, and for the pain, suffering a loss of enjoyment of life which he endured at the time of the accident and for some time thereafter.

The court awards plaintiff's medical bills to date of $12,954, and future medical expenses of $24,410. The court also awards compensation for pain, suffering, and the loss of enjoyment of life in the amount of $100,000.

## VIII.

The next issues are the claimed items of economic damage. In setting the award for economic damages, the court is making the following findings from the evidence:

First, the urchin fishing industry on the California coast has been in a general state of decline since 1992. There is danger that the California areas are "fished out," and it is at the very least harder to find abundant urchin beds. In addition, competitive urchin fisheries are developing in other areas of the world, in which plaintiff could not work. A continued decline of the California fishery can be expected in the future. There are however fewer licensed urchin fishermen. The catch per unit of effort declined until 1993, but has remained relatively stable since then. However, with the general decline in the California fishery as a whole, this figure too can be expected to decline in the future.

Second, plaintiff's anticipated work-life expectancy in this industry is only until age 50. The work is physically demanding. And with the general decline in the California fishery as a whole, it will be increasingly hard for an urchin fisherman to maintain a constant level of earnings.

Third, plaintiff has not made much effort at mitigation. That is, he has not actively sought other employment or educational opportunities to improve his earning capacity. The court is persuaded by the evidence that there are substantial opportunities for plaintiff in related industries. And further education would enhance plaintiff's earning potential.

It is clear from the evidence that as a result of the accident plaintiff was not able to work at his full previous capacity, from the date of the accident until he stopped diving in 1995. He has had virtually no earnings since then. For loss of earnings to date, the court awards the sum of $250,000. This is net of state and federal taxes, net of plaintiff's actual earnings during the period, and net of reasonable mitigation efforts.

The court awards plaintiff $24,000 for the loss of his boat. As a result of his diminished earning capacity in the year or so following the accident, he was unable to maintain the payments on the boat and suffered a loss in that amount.

An award of future economic losses is, at least in substantial part, driven by the three findings stated above — the decline in the industry, plaintiff's working capacity in that industry until age 50, and the availability of other occupations in related industries or with further educational training. The court awards for future loss of income the sum of $200,000. This figure is net of taxes and mitigation earnings, and is reduced to present value.

### IX.

The court therefore calculates plaintiff's total damages in the amount of $611,364. This must be reduced by twenty-five percent for plaintiff's comparative fault, which reduces the figure to $458,523. By virtue of his settlements with other defendants, plaintiff concedes in his pretrial statement that defendant Thomas must receive a credit of $101,000. This results in a total net award of $357,523.

Plaintiff also seeks prejudgment interest. In maritime cases, prejudgment interest is generally awarded unless there are exceptional circumstances that would make such an award inequitable. *Cooper v. Axelsson and Johnson*, 923 F.2d 1045, 1051 (n. 6) (3d Cir.1991). Defendant has made no argument that an award would be inequitable, or any other argument in opposition to prejudgment interest. The court therefore awards a rate of 5.5% per year, using a rate of investment securities which are free of state and federal income tax. It is applied to the items of plaintiff's net damages to date. This figure totals $57,238.

The total damage award to plaintiff is $414,761. Plaintiff is also awarded his costs of suit. Judgment will be entered accordingly.

IT IS SO ORDERED.